KEKER, VAN NEST & PETERS LLP
STUART L. GASNER - # 164675
sgasner@keker.com
LAURIE CARR MIMS - # 241584
lmims@keker.com
JENNIFER A. HUBER - # 250143
jhuber@keker.com
BAILEY W. HEAPS - #295870
bheaps@keker.com
MAYA PERELMAN - # 318554
mperelman@keker.com
VICTOR H. YU - #325411
vyu@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Attorneys for Plaintiff
THE SCRIPPS RESEARCH INSTITUTE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| THE SCRIPPS RESEARCH INSTITUTE,<br><br>                 Plaintiff,<br><br>          v.<br><br>TEVA PHARMACEUTICALS INTERNATIONAL GMBH,<br><br>                 Defendant. | Case No. 3:21-cv-02068-AJB-BLM<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff The Scripps Research Institute ("Scripps") alleges as follows against Defendant Teva Pharmaceuticals International GmbH ("Teva"):

## I.    INTRODUCTION

1.    This lawsuit arises from Teva's willful refusal to pay Scripps the royalties it is owed on cladribine sales in violation of the 2000 Sublicense Agreement ("Agreement") between Scripps and IVAX Corporation ("IVAX"), Teva's predecessor-in-interest.

2.    Scripps scientists first discovered the drug cladribine in the 1970s; it was subsequently developed and commercialized for the treatment of leukemia.  By 2000, cladribine was being explored in Phase II clinical trials as a potential treatment for multiple sclerosis.  Under the Agreement, in exchange for milestone payments and sales-based royalties, Scripps gave IVAX an exclusive license to all of Scripps's patent rights and its confidential and proprietary information concerning the manufacture, use and development of cladribine for the treatment of multiple sclerosis, including its confidential Investigational New Drug (IND) and draft New Drug Application (NDA) files, so that IVAX could further develop and commercialize the promising drug.

3.    The Agreement was a hybrid license including two distinct grants, covering both patent rights and clinical and regulatory know-how.  Accordingly, IVAX agreed to pay royalties on sales of licensed cladribine products in all countries where the products were being sold for a minimum of ten years from the first sale in that country, even if the patents covering those cladribine products expired in a given country before the ten year minimum payment term had lapsed, albeit at a stepped-down rate for sales for which there was no protection provided by the licensed patents.

4.    Because of a longer than anticipated development and regulatory path, the licensed patents expired a few years before the marketing approval of cladribine for the treatment of multiple sclerosis by the U.S. Food & Drug Administration

(FDA) and similar health regulatory agencies in other countries.  These approvals were based on the clinical development program built on know-how provided by Scripps under the Agreement.  Shortly after those long-awaited approvals, hundreds of millions of dollars of cladribine product, commercialized under the trade name Mavenclad, began being sold all over the world, including in the United States and European Union.  Under the terms of the Agreement, Teva now owes royalties to Scripps at the stepped-down rate on those sales, an obligation that continues for ten years after the first commercial sale of Mavenclad in each country.

5.     However, Teva has not upheld its end of the parties' bargain, refusing to pay royalties altogether in countries where there are expired patents.

6.     Put simply, Teva has reaped (and continues to reap) the benefits of its exclusive access to Scripps's intellectual property, while reneging on its obligations to pay royalties on sales as soon as those sales became a reality and the bill came due.

7.     Accordingly, Scripps now seeks the royalties that Teva has refused to pay, plus interest at the contractual rate, a declaration that confirms that the Agreement requires payment of the royalties going forward through ten years from first commercial sale of Mavenclad in each country in which it is sold, contractual prevailing-party attorneys' fees and costs, and any other relief that the Court may deem just and equitable.

## II.     PARTIES

8.     Scripps is a non-profit public biomedical research institute organized under the laws of California.  Its headquarters are located at 10550 North Torrey Pines Road, in La Jolla, California.  It is one of the most influential research institutes in the world; its research has paved the way for multiple approved drugs; it has more than 30 drug candidates in the pipeline as well as over 1,100 patents in breakthrough biomedical technology; and its scientists have won four Nobel Prizes, awards bestowed on those who "have conferred the greatest benefit on mankind."

9. Upon information and belief, Teva is a corporation incorporated in Amsterdam, Netherlands. Upon information and belief, Teva's parent company is Teva Pharmaceutical Industries Ltd., and Teva Pharmaceutical Industries Ltd. acquired IVAX Corporation in 2006.

10. On December 10, 2021, Scripps filed its complaint in this action against Teva Pharmaceutical Industries Ltd. and also named as defendants Does 1 through 10. As set forth in the original complaint, Scripps included the Doe defendants so that it could seek leave to amend to add other Teva corporate entities in the event Scripps ascertained the identities of additional Teva corporate entities other than Teva Pharmaceutical Industries that were responsible, in whole or in part, for the events and happenings alleged in this action.

11. On February 23, 2022, Teva's counsel represented to Scripps that after the Agreement was executed, IVAX assigned the Agreement to IVAX International GmbH. Teva's counsel also represented that Teva Pharmaceuticals International GmbH is (a) the successor in interest to IVAX International GmbH, (b) the entity that has issued royalty reports and has paid royalties to Scripps under the Agreement, and (c) is the sole Teva entity that has rights and obligations under the Agreement. Teva's counsel further represented that Teva Pharmaceutical Industries Ltd. is not a party (or a successor in interest) to the Agreement and has no rights or obligations under the Agreement.

12. Based on these representations, on March 3, 2022, Scripps agreed to amend its complaint to substitute Teva Pharmaceuticals International GmbH as the sole defendant in this action, without waiver of Scripps's right to later confirm Teva's counsel's representations in discovery.

## III. JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that this is a civil action arising under diversity jurisdiction.

1835484

14.     This Court has personal jurisdiction over Teva, which has had continuous and systematic contacts with the State of California, has purposely directed activities at the State of California, and this action arises out of and relates to those activities. As alleged herein, Teva's conduct occurred in California or was directed at Scripps, a California-based company.

15.     This lawsuit arises specifically out of Teva's obligations under its predecessor IVAX's Agreement with Scripps.  That Agreement, which was negotiated with Scripps employees and officers in California, created continuing obligations between IVAX (and later Teva) and Scripps.  These included, among other things, the obligation for IVAX (through Teva today) to make regular royalty payments to Scripps and furnish detailed written reports to Scripps regarding sales of cladribine.  Such payments are made to Scripps through Scripps's bank account in California.  Moreover, the Agreement specifically provided that any notices to be sent under the Agreement should be sent to Scripps at its La Jolla, California headquarters.  And, importantly, the parties explicitly agreed in Section 11.3 of the Agreement that it that would be construed and enforced in accordance with the laws of the State of California.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(d), in that this district is where the Agreement was executed and where its obligations were required to be performed.  As alleged herein, under the Agreement, Scripps agreed to provide and did in fact provide IVAX with its confidential know-how, which was both located and developed at Scripps's headquarters in this district.  Under Section 4.2, Scripps also agreed to and did in fact continue keeping IVAX (and later Teva) informed regarding its patent application and maintenance processes, which originated in this district.  In turn, IVAX agreed to make payments and provide reports to Scripps in this district, where Scripps resides.

1835484

## IV.   FACTUAL ALLEGATIONS

### A.   Scripps Pioneers Cladribine as a Treatment for Leukemia and Begins Exploring It as an Innovative New Treatment for Multiple Sclerosis

17.   The development and commercialization of cladribine as a treatment for multiple sclerosis has a long and complex history.  It began in the 1970s, when Scripps scientists Dennis Carson and Ernest Beutler discovered that cladribine was stunningly effective at targeting abnormal white blood cells (T and B lymphocytes) in patients suffering from hairy-cell leukemia.  And, although no pharmaceutical firm was initially willing to invest in exploring cladribine, Scripps decided to fund Carson and Beutler's early tests of the compound through its research infrastructure.  After seeing promising results, Scripps subsequently licensed its medical research to Johnson & Johnson ("J&J"), which conducted clinical trials and received approval to market cladribine to treat hairy-cell leukemia in 1983.  This was the first treatment that led to prolonged remission of hairy-cell leukemia, which had been previously untreatable.

18.   At that time, the mechanisms of multiple sclerosis—a chronic, often disabling disease that attacks the central nervous system—were not well understood.  Nor was there any treatment for it.  But Beutler and Carson, together with Scripps scientist and neurologist Jack Sipe, realized that cladribine might also be effective in targeting the T and B lymphocytes that drive multiple sclerosis.  They immediately initiated various studies, including applying for and obtaining a government grant in 1992 to perform the first Phase II trial of cladribine in multiple sclerosis.  Scripps scientists also initiated Phase II/III clinical studies of subcutaneously injected cladribine demonstrating its safety and efficacy in treating multiple sclerosis.  By 1999, the Scripps studies had generated data that revealed cladribine could slow multiple sclerosis deterioration, with patients showing virtually no side effects.  Indeed, the data from these studies revealed that cladribine

could achieve a dramatic and durable reduction in the number and volume of characteristic brain lesions seen in patients with active multiple sclerosis.

19.    As they received these positive initial results, Scripps grew confident that cladribine had promise as a treatment for multiple sclerosis.  Accordingly, Scripps continued working with J&J to develop cladribine, and Scripps scientists—including Carson and Beutler—filed for various process and method patents relating to the use of cladribine in treating multiple sclerosis.

20.    During this period, Scripps and J&J also worked together to put together the application for regulatory approval for cladribine as a treatment for multiple sclerosis, with J&J ultimately submitting an Investigational New Drug Application ("IND") for cladribine in 1998 and compiling materials for an associated New Drug Application ("NDA") based in part on the data obtained from the Scripps studies.  These applications included extensive confidential information about the preclinical and clinical studies conducted by Scripps and J&J, including the detailed study design and implementation protocols, along with the data, results, and analysis.

21.    Cladribine had shown significant results in treating multiple sclerosis patients, and in 1999, after the FDA indicated that more clinical data would be needed, J&J licensed its rights in cladribine for use in treatment for multiple sclerosis back to Scripps.

22.    Under the J&J License, which was executed in October 1999, J&J agreed to grant its rights to "Scripps Inventions"—specifically, the technology and research concerning the use of cladribine for the treatment of multiple sclerosis—back to Scripps.  J&J further granted Scripps the rights to additional research, technology, and inventions developed by J&J concerning the use of cladribine for the treatment of multiple sclerosis.  To that end, J&J granted Scripps a worldwide exclusive license to any patent rights and know-how relating to the use of cladribine in the "therapy or preventative treatment of multiple sclerosis in humans."  J&J

further specified that "know-how" included "all inventions, discoveries, trade secrets, improvements, and technical information, and whether or not patentable, together with all experience, data, formulas, clinical, and assay information." Finally, the J&J License provided that, following execution of the agreement, J&J would complete a technology transfer to Scripps that included all data, information and results upon which the Investigational New Drug (IND) application for the use of cladribine for treatment of multiple sclerosis relied, together with the associated draft materials for the New Drug Application (NDA).

**B.      Scripps Explores Options for Advancing Development of Cladribine, and Ultimately Executes the Agreement with IVAX**

23.      As the J&J License acknowledged, Scripps is not in the business of marketing or selling pharmaceuticals.  Rather, as an academic institution, Scripps is involved in drug discovery and scientific research, and typically licenses the drugs it discovers or develops in their early stages to for-profit companies who have the financial incentives and resources to conduct the costly large-scale clinical trials required for regulatory approval and commercialize drugs for the public benefit.

24.      Thus, after re-acquiring J&J's rights, Scripps set about identifying another licensee that would be able to build on Scripps's years of research and development to commercialize cladribine.  To that end, in the fall of 1999, Scripps reached out to various pharmaceutical organizations, including Teva Pharmaceutical Industries Ltd., regarding a potential license to cladribine and describing the trials conducted to date, by both Scripps and J&J.  At that time, Teva Pharmaceutical Industries Ltd. (which had not yet acquired IVAX) responded, indicating its interest in cladribine.  However, IVAX also reached out, and Scripps ultimately proceeded with negotiations with IVAX.

25.      Over the course of 2000, Scripps and IVAX negotiated license terms that would allow IVAX to further develop and commercialize cladribine to treat

1835484

multiple sclerosis.  The final version of the Agreement was executed on November 29, 2000 and is attached here as **Exhibit A.**

26.     Under the Agreement, Scripps granted IVAX an "exclusive, worldwide sublicense, including the right to sublicense, to PATENT RIGHTS and KNOW-HOW, to make, to have made, to use, to import, to offer for sale, and to sell LICENSED PRODUCTS in the FIELD."  Both "Patent Rights" and "Know-How" were defined by reference to the 1999 J&J License, which was an exhibit to the Agreement.  The Agreement grants IVAX a right to Scripps's trade secrets, inventions, discoveries, improvements, and technical information, whether or not patented or patentable (in addition to the patent rights).  In addition, the Agreement required Scripps "to provide IVAX with information received by Scripps from J&J under Paragraph V of the J&J License"—that is, with the confidential and trade secret information conveyed in the J&J technology transfer, including the IND application, the draft NDA materials, and all the supporting pre-clinical and clinical data.  This constituted years of valuable research and development, and contained detailed information regarding testing materials, treatment media, data handling procedures, raw data from studies, Scripps's and J&J's analysis of the data from both the preclinical and clinical studies, and back and forth correspondence with regulators providing additional information regarding J&J's IND for cladribine.

27.     In return, the Agreement obligated IVAX to make two milestone payments, which would be triggered by the approval of cladribine in the United States and in Europe, and to pay continuing royalties on sales of the commercialized product.  These royalties ranged from 4% to 8%, depending on the amount of the net sales of cladribine, as set forth in Section 3.3.1 of the Agreement. Under Section 3.4.1 of the Agreement, such royalties would be due "within sixty (60) days after the end of each calendar quarter, based upon the net sales of licensed products during each preceding calendar quarter."  Section 3.4.2 further provided that, where sales were made by sublicensees of IVAX or its affiliates, royalties

would be payable "within ninety (90) days after the end of each calendar quarter, based upon the net sales of licensed products by such sublicensee during such preceding calendar quarter." And, pursuant to Section 3.6, IVAX agreed that if IVAX granted sublicenses to any party with respect to the rights conferred upon it under the Agreement, "IVAX shall pay Scripps, or cause its affiliate or sublicensee to pay Scripps, the same royalties on all net sales of such affiliate or sublicensee the same as if said net sales had been made by IVAX."

28.    The duration of the royalty obligations, set forth in Section 3.7 of the Agreement, was set forth as follows:

> "Duration of Royalty Obligations. The royalty obligations of IVAX as to each LICENSED PRODUCT shall terminate on a country-by-country basis concurrently with the expiration of the last to expire of PATENT RIGHTS utilized by or in such LICENSED PRODUCT in each such country or, with respect to LICENSED PRODUCTS sold in a country for which there are no PATENT RIGHTS, ten (10) years after the date of first commercial sale of such LICENSED PRODUCT in such country; provided that the royalty payable with respect to such sales in such country shall be seventy-five percent (75%) of the royalty that otherwise would be payable pursuant to this Agreement."

Thus, the Agreement requires IVAX to pay the full amount of royalties due under Section 3.3.1 (ranging from 4-8%) until expiry of Patent Rights covering Mavenclad on a country-by-country basis, and to pay royalties at a stepped-down rate—i.e., at 75% of the full royalty rate—on Mavenclad sales both in countries where the licensed patents had expired or where Scripps had never held Patent Rights at all for ten years after the first commercial sale in each such country. By its plain terms, the reference to products sold in a country "for which there are no patent rights" encompasses sales both in countries in which Patent Rights have expired as of the time of the sale of the licensed products and countries in which there were never any Patent Rights utilized by or in the licensed product. In this way, by creating a stepped-down rate that would apply after the expiration of the

1  Patent Rights, the parties ensured that the Agreement and its royalty obligations

2  complied with the Supreme Court's guidance in *Brulotte v. Thys Co.*, 379 U.S. 29

3  (1964) and its progeny.  *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 454 (2015)

4  (explaining that license that set one royalty rate for patent-protected sales and a

5  slightly reduced rate after all the patents had expired would be fully compliant with

6  *Brulotte*).

7      29.   Finally, the Agreement imposed certain reporting obligations on

8  IVAX.  Under Section 3.8 of the Agreement, IVAX agreed to furnish "detailed

9  written reports of net sales" and "the royalty due and payable thereon," at the time

10  of making each royalty payment, "on a product-by-product and country-by-country

11  basis, for the calendar quarter upon which the royalty payment is based."

12  Agreement at § 3.8.  And, to the extent that any audits subsequently reveal that

13  Scripps was underpaid royalties, "IVAX, its affiliates and sublicensees shall pay to

14  Scripps an amount equal to any additional royalties to which Scripps is entitled as

15  disclosed by the audit, plus interest thereon at the rate of one and one-half percent

16  (1.5%) per month."  Agreement at § 3.9.

    **C.   IVAX Sublicenses its Rights on Cladribine to Merck, Which Continues Development on Cladribine and Enables its Commercial Success**

19      30.   Less than two years after executing the Agreement, IVAX turned to

20  Serono International SA ("Serono") to do the work of continuing development of

21  cladribine and marketing it globally in a revised oral formulation to treat multiple

22  sclerosis.  To this end, IVAX entered into a sublicense agreement with Ares

23  Trading S.A. (a subsidiary of Serono) on October 16, 2002, wherein IVAX granted

24  Serono (through Ares) a license to Scripps's Patent Rights and know-how, as

25  defined in the Agreement, in exchange for various milestone payments and

26  continuing royalties on sales (the "Serono Sublicense").

31.     In 2005, Teva Pharmaceutical Industries Ltd. signed an agreement to acquire IVAX, and completed that acquisition in 2006.  Also in 2006, Merck & Co., Inc. ("Merck") acquired Serono.

32.     Pursuant to the Serono Sublicense, Serono/Merck continued conducting additional clinical studies based on an oral formulation of cladribine.  In 2009, Merck applied for regulatory approval in Europe and the United States based on those studies.  However, the European Medical Authority (EMA) and FDA did not approve these applications, determining that more information was needed.

33.     At the time of these determinations, several clinical trials were still ongoing, and Merck committed to completing them.  In 2015, with more robust data from the completed clinical trials in hand, Merck announced it would again seek regulatory approval for cladribine, now under the name Mavenclad.

34.     On August 22, 2017, the EMA granted authorization for Mavenclad to be marketed for use in treatment of multiple sclerosis.  At that time, Teva—as IVAX's successor-in-interest—made the required milestone payment to Scripps under Section 3.2 of the Agreement.  Approval by the FDA followed less than two years later, on March 29, 2019, at which time Teva made the second required milestone payment to Scripps pursuant to Section 3.2 of the Agreement.

35.     Following the relevant regulatory approvals, sales of Mavenclad began and quickly skyrocketed worldwide.  Merck's annual reports indicate that total worldwide sales were approximately $100 million in 2018, about $360 million in 2019, and about $600 million in 2020.  By the end of 2021, total worldwide sales of Mavenclad are projected to be over $800 million a year.

**D.     Teva Refuses to Pay the Required Royalties in Breach of the Plain Terms of the Agreement**

36.     Although Teva, as IVAX's successor-in-interest, has acknowledged that it is bound by the terms of the Agreement (including by making the milestone payments described above), it has failed to abide by its royalty obligations.  Under

the clear terms of the Agreement, Teva must pay Scripps royalties on net sales made by Merck "the same as if said net sales had been made by IVAX." Agreement § 3.6.  Yet, despite Merck's impressive net sales figures and projected growth for Mavenclad, Teva has not paid Scripps any of the royalties owed under the Agreement related to sales in the United States or for numerous other countries, including those in the European Union.

37.    Under Sections 3.4.1 and 3.4.2 of the Agreement, Teva was required to pay royalties to Scripps within sixty days—or, in the case of sales by a sublicensee such as Merck, within ninety days—of the end of the calendar quarter in which there were net sales of cladribine.  Under Section 3.8 of the Agreement, reports of such sales were due at the same time.  Upon information and belief, net sales of Mavenclad commenced in Europe sometime in the third quarter of 2017 following regulatory approval by the EMA, meaning that Teva's obligation to make royalty payments to Scripps on sales in European countries was triggered within ninety days of the end of the third quarter of 2017—i.e., on or about December 29, 2017.  Teva was also required to furnish a "detailed written report" to Scripps reporting on net sales on a country-by-country basis at the same time.

38.    Upon information and belief, commercial sales of Mavenclad commenced in the United States sometime in the second quarter of 2019 following regulatory approval by the FDA, meaning that Teva's obligation to make royalty payments to Scripps on sales in the United States was triggered within ninety days of the end of the second quarter of 2019—i.e., on or about September 28, 2019.  Likewise, its obligation to furnish a "detailed written report" to Scripps reporting on net sales in the United States was triggered at the same time.

39.    But Teva failed to make payments on *any* sales in the United States or in any other countries in which Patent Rights had previously existed but had since expired, nor has Teva ever provided reports on such sales.

40.     Rather, Teva's approach to the Agreement is to cherry-pick portions of the Agreement with which to comply, while flouting its more substantial obligations with regard to the royalty payments.  Thus, while Teva made the required milestone payments to Scripps in 2017 and 2019, when Mavenclad received regulatory approval from the EMA and the FDA, respectively, it has failed to make any of the required royalty payments at the stepped-down rate on sales in countries where patents have expired.

41.     Instead, it has only made royalty payments on sales in countries where no Patent Rights ever existed, including in Bulgaria, Croatia, Estonia, Slovakia, and Qatar.  Upon information and belief, the total revenue from sales in countries where no Patent Rights ever existed accounts for less than 6% of revenue from global sales.  Nor has Teva also ever furnished Scripps with the required reports disclosing the net sales of Mavenclad, which would have allowed Scripps to calculate the total royalties it was due and invoice Teva accordingly.

42.     In December 2019—a few months after the FDA issued regulatory approval to Mavenclad—Scripps reached out to Teva to inquire about Teva's apparent failure to pay royalties on any commercial sales in countries where patents had expired, or to provide reports on any such sales.  As Scripps explained, "Under section[] 3.7 of the Agreement, Teva is obligated to pay Scripps a royalty in a percentage dependent on global net sales of Cladribine, on a country-by-country basis until, as applicable here, 'ten (10) years after the date of first commercial sale' of Cladribine in each country."  Scripps further noted that, "The Agreement is drafted as a typical pharmaceutical intellectual property license in that it licenses both patents and know-how … Further, like the majority of licenses in this industry, the Agreement contemplates that Teva will pay Scripps a full royalty in countries where there are valid patent claims and a 'step-down' royalty in countries where the patent claims have expired, which in the case of Cladribine includes all countries in which the drug is sold."

1835484

43.     Teva responded tersely two weeks later, stating only that it disagreed with Scripps's interpretation of the Agreement, and asserting without any support or explanation that it was complying with its applicable royalty obligations.

44.     This was the first time that Teva (or IVAX) had taken the surprising position that it apparently owes *no* royalties for sales in countries where patents have expired.  It is both contrary to the terms of the Agreement and to the extrinsic evidence, including the negotiations surrounding the Agreement and industry standards regarding pharmaceutical licenses that include rights to both patents and know-how.

45.     As discussed herein, the plain terms provide that royalties were due at the 75% rate for sales of cladribine "for which there are no patent rights" for ten years following the first commercial sale in each country in which it is sold. Plainly, products sold in a country in which Patent Rights have expired are products sold in a country in which there *are*—present tense at the time of sale—no Patent Rights.  If, instead, the intention of the Agreement was to limit the stepped-down royalty products sold in countries for which "there have never been patent rights"— a provision that makes no commercial sense—the Agreement would have used that or similar language.

46.     Moreover, the negotiations surrounding this term make clear that the parties' intention was to provide for continuing royalties to compensate for the valuable know-how licensed to IVAX under the Agreement, albeit at a stepped-down rate after patents had expired.

47.     The initial draft of the Agreement that Scripps provided to IVAX in July of 2000 contained an earlier version of Section 3.7 that provided as follows: "The royalty obligations of IVAX as to each LICENSED PRODUCT shall terminate on a country-by-country basis concurrently with the expiration of the last to expire of PATENT RIGHTS utilized by or in such LICENSED PRODUCT in each such country or, with respect to LICENSED PRODUCTS not utilizing any

14

1  PATENT RIGHTS, fifteen (15) years after the date of first commercial sale of such
2  LICENSED PRODUCT in such country."

3       48.    The parties engaged in discussions regarding the period of time during
4  which royalties would be due following the first commercial sale, with IVAX
5  proposing to reduce that term to ten years rather than fifteen years and Scripps
6  agreeing to that change.  However, in a later draft sent back IVAX on October 24,
7  2000, in addition to reducing the term to ten years, IVAX struck the second clause
8  of Section 3.7 *entirely*, so that it provided only that royalty obligations would be
9  extinguished when the Patent Rights expired.  In other words, IVAX took the
10  position that it should owe no royalties after the expiration of the licensed patent
11  rights.  Scripps did not agree to this and the parties ultimately agreed that IVAX
12  would continue to owe royalties, albeit at a stepped-down rate, after the expiration
13  of the licensed Patent Rights.

14       49.    Specifically, Scripps objected to IVAX's proposed edit, noting that
15  this constituted a material change to the terms and explaining to IVAX, "During our
16  phone conversation on August 16, 2000, we agreed to your proposal to reduce the
17  term to 10 years.  You have now eliminated the obligation [to pay royalties post-
18  expiration] completely. We are confused and would appreciate your comments."  In
19  related communications, Scripps raised concerns with IVAX about edits made by
20  IVAX that suggested that Scripps would only receive royalties related to its Patent
21  Rights, "and not under a use patent or for the use of our know-how."  This was, of
22  course, unacceptable to Scripps.  Accordingly, following a conversation between
23  the parties in which they discussed providing for royalties at a stepped-down rate,
24  IVAX circulated an updated draft containing what became the final language,
25  which reinserted the provision for continued royalties—albeit using slightly
26  different language—for sales of cladribine post-expiration of patents, at a stepped-
27  down rate for a period of ten years from first commercial sale in the country in
28  which the sales are made.

50.     Thus, the history of the negotiations makes clear that Section 3.7 was intended to provide for continuing royalties on products sold following patent expiration in exchange for its valuable know-how.  Indeed, Scripps objected to any version of the Agreement that did not include this obligation.

51.     Section 3.7 thus means that for any sales of a cladribine product for which there are no Patent Rights at the time of sale (as is the case for all Mavenclad sold), Scripps is entitled to a stepped-down royalty at 75% of full royalty rates for ten years after the first commercial sale in each country in which the drug is sold.  Indeed, Scripps licensed extensive know-how to IVAX—as the Agreement expressly states—and reasonably expects a return on that valuable know-how, even if it does not have any ongoing Patent Rights on sales in the country where the drug is being sold.

52.     This interpretation of Section 3.7 is also consistent with the overall structure of the agreement, and consistent with industry standard practices for license agreements that license both patents and know-how.  Drug development is a lengthy process, and licensors of intellectual property rights claiming or covering drugs, such as Scripps, frequently contemplate that the useful commercial life of a drug may extend beyond—or may even begin after—the initial patents protecting that drug have expired.  Simply because time has passed between an initial enabling license and the commercialization of a drug is not a reasonable rationale for not paying an amount that is owed for commercial access to valuable information and data, and licensors of such rights still expect to be compensated as a result of their contributions that paved the way to commercialization.

53.     Moreover, this interpretation of Section 3.7 is consistent with the provisions in the sublicense to cladribine that IVAX itself executed less than two years after the Agreement was signed, and under which, upon information and belief, Teva is receiving significant royalty payments from Merck for Merck's sales of Mavenclad.  As alleged herein, IVAX entered into the Serono Sublicense in 2002

to sublicense the intellectual property rights in cladribine that Scripps had licensed to it only two years earlier.  That agreement has a "duration of royalty obligation" provision that aligns with Section 3.7 of the Scripps IVAX sublicense, providing as it does that Ares owes royalties at one rate where the product was covered by a valid patent, and at a lower stepdown rate where the product was no longer covered by a valid sublicensed patent.

54.    The structure of Serono Sublicense royalty duration and stepdown royalty provisions reflect that IVAX understood that it would owe post-patent-expiration royalties under the Agreement at a stepped-down rate.  It therefore negotiated a similar provision regarding duration of royalty obligations in the Serono Sublicense so that it would be in a position to make the payments to Scripps under the Agreement.  Moreover, the Serono Sublicense indeed provides that IVAX receives royalties on sales in every country—regardless of whether the patent covering that product has expired in that country—for ten years following the first commercial sale.  Thus, IVAX—through Teva—is now receiving the substantial benefit of Scripps's intellectual property through the royalties it receives from Merck, all while refusing to pay Scripps for the intellectual property that paved the way for Mavenclad's ultimate commercialization.

55.    Put simply, Teva's newly-asserted and self-serving interpretation of the Agreement is nothing more than an attempt to evade its obligations to pay Scripps what it is rightfully owed.

## V.    FIRST CAUSE OF ACTION

### Breach of Contract

56.    The preceding paragraphs are incorporated herein by reference.

57.    At all relevant times since November 2000, there was a written, valid contract between Scripps and Teva, as IVAX's predecessor-in-interest, i.e., the Agreement, with the most relevant terms described in more detail in Paragraphs 28 and 29 above.  Its terms obligate Teva to make royalty payments to Scripps on net

sales of cladribine for ten years following the first commercial sale, regardless of whether the patents covering the product have expired.  In addition, and as also discussed above, the Agreement requires Teva to provide "detailed written reports of net sales" and "the royalty due and payable thereon," at the time of making each royalty payment.

58.     Scripps has performed all of its obligations due and owing under the contract and has provided Teva all of the bargained-for consideration.

59.     Teva has engaged in multiple breaches of the contract.  In particular, Teva has refused to pay royalties owed under Section 3.7 of the Agreement, and has failed to provide royalty reports related to net sales in countries where there are expired patents, including the United States and European Union countries, as required under Section 3.8 of the agreement.

60.     More specifically, Section 3.7 requires Teva to pay, for ten years after the first commercial sale of Mavenclad (and any other drug that meets the definition of "LICENSED PRODUCT"), royalties at a stepped-down rate of 75% of the royalties specified in Section 3.3.

61.     By reason of the foregoing, Scripps is liable in an amount of to be proven at trial, plus contractual interest pursuant to Section 3.9 of the Agreement of 1.5% per month, as set out in Paragraph 29 above.

62.     Scripps is also entitled to recover its reasonable attorneys' fees and other costs incurred in connection with this dispute, pursuant to Section 11.8 of the Agreement, which provides for attorneys' fees to the prevailing party in a dispute arising under the Agreement.

## VI.     SECOND CAUSE OF ACTION

### Breach Of Covenant of Good Faith and Fair Dealing

63.     The preceding paragraphs are incorporated herein by reference.

1835484

64.     The Agreement between IVAX and Scripps included an implied covenant of good faith and fair dealing that neither party would interfere with the right of the other to receive the benefits of the contract.

65.     Following the execution of the Agreement in 2000, Scripps has performed all tasks required of it under the Agreement, including turning over its intellectual property in cladribine—which consisted of Scripps's decades of research and work into cladribine's possible applications and indications.   Indeed, the clinical and regulatory know-how contained in the data and intellectual property that Scripps transferred to IVAX—including in its voluminous IND application and draft NDA files—enabled IVAX, and two years later, its sublicensee Serono/Merck, to engage in the subsequent clinical testing and development that led to regulatory approval for cladribine as a treatment for multiple sclerosis.

66.     In reaping the benefits of the commercial sales of Mavenclad while refusing to compensate Scripps for its contributions to the development of Mavenclad, Teva has acted and is continuing to act unfairly and not in good faith. Moreover, its failure to provide Scripps with the required sales reports have prevented Scripps from being able to fairly assess its entitlement to royalties under the Agreement.

67.     Teva's actions have deprived Scripps of the benefits of the Agreement and of its entitlement to the bargained-for compensation for its intellectual property.

68.     Scripps requests the relief specified below.

## VII.   THIRD CAUSE OF ACTION
### <u>Declaratory Relief</u>

69.     The preceding paragraphs are incorporated herein by reference.

70.     An actual controversy has arisen and now exists between Scripps and Teva concerning their respective rights and duties.  Scripps, as specified above, contends that Teva has breached the Agreement by failing to pay any royalties related to sales of Mavenclad in countries where Patent Rights have expired,

including in the United States and major European markets, at the stepped-down rate required under Section 3 of that Agreement. Scripps also contends that Teva has breached its duties by failing to provide royalty reports for sales of Mavenclad in those same territories.

71. Teva disputes the contentions in the above paragraph and has refused to pay royalties owed under Section 3.7 of the Agreement or to provide royalty reports related to net sales in countries where Patent Rights have expired, including the United States and European Union countries, as required under Section 3.8 of the agreement.

72. A judicial declaration is therefore necessary and appropriate so that Teva will pay to Scripps the royalties owed under the Agreement as well as provide the required royalty reports, both for past and future sales.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Scripps respectfully requests the following relief:

1. For judgment in Scripps's favor and against Teva on all causes of action alleged herein;

2. For damages to be proven at trial;

3. For a declaratory judgment that Section 3.7 of the Agreement requires Teva to pay royalties at the 75% rate for all sales of Mavenclad and any other cladribine product used in the treatment of multiple sclerosis on sales in countries for which there are no Patent Rights for ten years following the first commercial sale in all such countries, regardless of whether the Patent Rights related to such sales expired or never existed;

4. For a declaratory judgment that Section 3.8 of the Agreement requires Teva to furnish "detailed written report[s]" to Scripps on the net sales of Mavenclad and any other cladribine product used in the treatment of multiple sclerosis, and the royalty due thereon, on a product-by-product and country-by-country basis, regardless of whether Patent Rights related to such sales have expired or never

1835484

1   existed;

2       5.    For costs of suit incurred herein;

3       6.    For an accounting of net sales of Mavenclad and any other cladribine

4   product used in the treatment of multiple sclerosis, and the royalties due thereon;

5       7.    For pre-judgment and post-judgment interest, including interest

6   pursuant to Section 3.9 of the Agreement;

7       8.    For attorneys' fees and costs as the prevailing party under Section 11.8

8   of the Agreement; and

9       9.    For such other and further relief, including any appropriate equitable

10  relief, as the Court may deem to be just and proper.

11              **<u>DEMAND FOR JURY TRIAL</u>**

12      Scripps demands a jury trial on the claims alleged herein.

13

14  Dated: March 15, 2022                    KEKER, VAN NEST & PETERS
                                             LLP
15

16                                    By:   */s/ Stuart L. Gasner*
17                                           STUART L. GASNER
                                             LAURIE CARR MIMS
18                                           JENNIFER A. HUBER
                                             BAILEY HEAPS
19                                           MAYA PERELMAN
                                             VICTOR YU
20
                                             Attorneys for Plaintiff
21                                           THE SCRIPPS RESEARCH
                                             INSTITUTE
22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL
Case No. 3:21-cv-02068-AJB-BLM

1835484